UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WAYNE MASON, JR. and MICHAEL MASON o/b/o WAYNE MASON, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) 05 C 5827 ) ) Judge George M. Marovich |
| JO ANNE B. BARNHART, COMMISSIONER OF THE SOCIAL SECURITY ADMIN., | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Wayne Mason, Jr. and Michael Mason filed this action to appeal a final administrative decision denying an application filed by their father, Wayne Mason ("Mason") for Disability Insurance Benefits and Supplemental Security Income. Plaintiffs and defendant have filed cross-motions for summary judgment on the administrative record. For the reasons set out below, the Court denies the plaintiffs' motion and grants defendant's motion.

### I. Background

On September 13, 1994, Mason applied to the Social Security Administration ("SSA") for disability insurance benefits ("DIB") and supplemental security income ("SSI") on the basis of disability. (R. 78-84). In his application, Mason stated that he became disabled on August 24, 1993. (R. 78). As of September 13, 1995, the date of the first hearing, Mason was a fifty-one-year-old man. (R. 78). He died approximately two weeks after the first hearing. Mason's sons seek the disability benefits they claim Mason was entitled to before his death.

**Mason's educational background and work experience**

Mason graduated from high school in 1962. (R. 47, 116). Prior to applying for disability benefits, Mason worked in several types of jobs. For about ten years beginning in 1978, Mason worked as a driver for a garbage collection company. (R. 49, 116). For about six months in 1993, Mason worked in maintenance as Kendall College. (R. 47-48). That was his last job. (R. 47).

**Mason's physical condition**

*Mason's description of his impairments*

Mason described in his application interview and at a hearing before the Administrative Law Judge ("ALJ") the illnesses and symptoms that he claimed affected his ability to work. In his application interview on or about September 13, 1994, Mason stated that seizures prevented him from working because he would suffer "blackouts." (R. 112).

When he applied for benefits, Mason weighed 120 pounds. (R. 119). By September 13, 1995, the date of the hearing, Mason, who was 5'9", testified that his weight was 100 pounds. (R. 45). He testified that over the previous three years, his weight had fluctuated from a high of 155 pounds to a low of 98 pounds. (R. 45).

As Mason testified, in the months leading up to his death, he suffered a series of about eight seizures. (R. 50-51). When he suffered a seizure, Mason sometimes hit his head and bit his tongue. (R. 67). Mason understood that doctors thought his seizures were caused by alcohol withdrawal though the doctors did not find alcohol in his system at the time of the seizures. (R. 68).

Mason's statements about his alcohol consumption were inconsistent. At the September 1995 hearing before the ALJ, Mason testified that after he started having seizures, he cut back his alcohol consumption to two shots of alcohol approximately once per week. (R. 54). Mason testified that before he cut back, he was drinking approximately ½ pint of liquor every other day. (R. 54). Mason testified that he did not have an alcohol abuse problem. (R. 54). In August 1994, Mason told a nurse that he was drinking two drinks per day but not every day. (R. 309). The nurse thought he was minimizing his alcohol consumption. (R. 309). In his October 1994 "Drug and Alcohol Use Questionnaire," Mason stated that he had "no drug or alcohol problems." (R. 182-183). Mason answered "no" or "none" when asked when he started drinking, how much he drank and what kinds of alcohol he consumed. (R. 182). Mason filled out another such form in December 1994. At that time, Mason admitted that he started drinking in 1978 and consumed one pint of alcohol every two days. (R. 199). Mason also stated that he stopped drinking in September 1994. (R. 200). In January 1995, Mason admitted to a doctor that for many years he consumed ½ pint of hard alcohol every two days and four cans of beer per day. (R. 201). Mason also stated that in 1993 he cut back to ½ pint per week and one can of beer per week. (R. 201). In February 1995, Mason told his examiner that he had cut back his alcohol consumption to three or four cans of beer and one pint of hard alcohol per week. (R. 208). When hospitalized in March 1995 for seizures, Mason admitted that he consumed ½ pint of alcohol per day. (R. 331). When he was hospitalized on August 22, 1995, Mason admitted that he drank ½ pint of alcohol per day. (R. 240).

In addition to the seizures, Mason testified that his leg, feet, hips and back occasionally swelled. (R. 58). Mason testified that he has been bothered by pain in those areas since a 1968

surgery and that the pain usually "kicks in" during damp and/or cold weather. (R. 59-60). The pain usually lasted a day. (R. 60). Mason testified that he did not regularly take pain medication. (R. 61). As to functional limitations, Mason testified that he could lift 10-15 pounds. (R. 62). Mason stated that he could walk the three-to-five blocks from his home to the grocery store. (R. 62). He noted that he generally sat about six hours per day, stood about one hour and walked about one hour. (R. 117).

Mason also testified at the hearing about how he spent his time. Mason usually went to bed around 10:30 p.m. and woke up around 5:30 or 6:00. (R. 56, 58). He generally spent his days at either his or his stepfather's home. (R. 56-57). Mason either drove there or took a bus. (R. 57-58). Mason did his own cooking and cleaning. (R. 57).

*Other testimony about Mason's impairments*

Robert Barefield, who had known Mason since 1958, testified that he saw Mason nearly every day. (R. 71-72). Barefield testified that Mason did not drink, although he admitted that Mason might drink "a little." (R. 73). He had seen Mason suffer three seizures, during which Mason "blank[ed] out," thrashed and shook. (R. 72). Other than the seizures, Barefield had not noticed Mason having any other problems. (R. 76).

Mason's neighbors submitted descriptions of Mason's seizures. (R. 66). Mary Brandy noted in her October 18, 1994 report that she had witnessed four seizures between June and August 1994. She noted that Mason thrashed, lost consciousness and bit his tongue. (R. 171). Mary Hood witnessed three seizures. (R. 193). Charles Miller witnessed two of Mason's seizures, including one in front of a store. (R. 192).

At the second hearing, Mason's sons and former wife testified. Plaintiff Michael Mason testified that in the last few years before Mason's death, Michael Mason saw his father about once per week and never saw his father drink. (R. 426). Michael Mason also testified that his father walked with a bad limp. (R. 427). Mason's other son, Wayne Mason, testified that he saw his father every weekend. (R. 428). Wayne Mason observed that his father had difficulty walking and could not sit down for very long. (R. 429). Wayne Mason never saw his father drink. (R. 429). Rita Mason, Mason's ex-wife, testified that she saw Mason drink a little. (R. 431). Rita Mason also noticed that Mason's knees swelled up. (R. 433).

*The medical evidence of Mason's impairments*

The medical records suggest that Mason suffered his first seizures prior to August 1992. (R. 131). During an August 1992 hospital visit, an intake nurse noted that she recognized Mason from his prior seizures. (R. 132). The nurse noted that Mason admitted drinking a few drinks a few times per week but denied drinking more than that. (R. 132). The discharge instructions told Mason not to drink alcohol. (R. 131).

Mason suffered another seizure in November 1993. He was taken to the emergency room, where he suffered a second seizure. (R. 128). The emergency room report diagnosed Mason with a seizure disorder and alcohol abuse. (R. 128).

In June 1994, Mason suffered a seizure and was treated at Evanston Hospital. (R. 161). Dr. Field, M.D. diagnosed Mason with alcohol withdrawal seizure. (R. 161). When he arrived at the emergency room, Mason first told the doctors that his last drink was three days earlier, but he later admitted that it had been the day before. (R. 161). When Mason was discharged, he was told to abstain from alcohol. (R. 161).

Mason returned to Evanston Hospital in August 1994. (R. 309). The medical staff concluded that Mason was suffering from alcohol abuse and withdrawal. (R. 309, 310, 312, 313, 318). In September 1994, Mason returned again to Evanston Hospital. The doctor, Dr. Zafar, who examined Mason noted that his medical complaints, including seizure disorder, were caused by alcohol abuse and gastroenteritis. (R. 145-146).

In October 1994, Dr. James Dunphy, M.D. ("Dr. Dunphy") examined Mason. He diagnosed Mason with withdrawal seizures and noted that Mason's mental status was slowed, perhaps due to chronic alcohol use. (R. 175).

On October 26, 1994, Dr. Charles Kenney, M.D. ("Dr. Kenney") conducted a functional capacity assessment of Mason. Dr. Kenney found no exertional limitations, no postural limitations, no manipulative limitations, no visual limitations and no communicative limitations. (R. 185-188). Dr. Kenney found, however, that because of Mason's seizures, he should avoid heights and hazardous machinery. (R. 188).

On November 14, 1994, Dr. Ernst Bone, M.D. ("Dr. Bone") examined Mason and signed a "Disability Determination and Transmittal" form. (R. 85- 95). Dr. Bone found no evidence of mental disorders, psychotic disorders, affective disorders, mental retardation, anxiety disorders, somatoform disorders or personality disorders. (R. 88-91). Dr. Bone concluded, however, that Mason suffered seizures as a result of regular substance use. (R. 92). Dr. Bone concluded that Mason suffered "slight" restrictions in activities of daily living and in maintaining social functioning, often had difficulty concentrating and never suffered work problems. (R. 93).

In a second review, Dr. Paul LaFata, M.D. ("Dr. LaFata") noted Mason's history of alcohol abuse, noted his inability to follow detailed instructions and concluded that Mason could perform light work and unskilled jobs. (R. 102-103).

Yet another medical doctor, Stephen Epner, M.D. ("Dr. Epner"), examined Mason on January 10, 1995. Dr. Epner noted that he had reviewed Mason's EEG, which showed "no focal source for seizures and no epileptic form of activity." (R. 201). Among other things, Dr. Epner noted that Mason's weight was 98 pounds. (R. 202). He also noted that Mason experienced throbbing pain in his knees in cold and damp weather, that Mason had a decreased range of motion in his right knee and that Mason had a normal range of motion in his hips. (R. 204). Dr. Epner diagnosed a history of alcohol abuse, hip and knee pain and a history of seizure disorder. (R. 204).

On February 11, 1995, John Tomassetti, Ph.D. ("Tomassetti") conducted a functional capacity assessment of Mason. (R. 206-209). Tomassetti noted that Mason was moderately limited with respect to the ability to understand and carry out detailed instructions but was not otherwise limited as to understanding, memory, concentration, social interaction or adaptation. (R. 206-207). Tomassetti concluded that Mason had the mental capacity to perform simple, unskilled work. (R. 208).

Mason returned to Evanston Hospital for four days in March 1995 after suffering a grand mal seizure at home and another one in the ambulance. (R. 331). Upon release, Dr. Dunphy urged Mason to stop drinking alcohol. (R. 333). The medical records from that visit indicate that Mason's seizures were a result of alcohol withdrawal. (R. 342, 344). Dr. Dunphy's instructions to Mason upon release stated, "<u>NO ALCOHOL</u>!!!" (R. 348).

From August 22 to 24, 1995, Mason was again hospitalized at Evanston Hospital for seizures. (R. 223). The principal diagnoses were seizures and alcoholic hepatitis. (R. 349). Upon discharge, Dr. Kaza prescribed Mason prenatal vitamins. (R. 223). Dr. Kaza also instructed Mason, "No drinking alcohol. Your life depends on it." (R. 223).

About one month later, on September 26, 1995, Mason died. When he arrived at the hospital that day, he reported that he began throwing up a few days before. (R. 228). He admitted being a binge whiskey drinker. (R. 228). His death certificate lists an acute upper gastrointestinal bleed and chronic and acute alcohol use with coagulopathy as the causes of death. (R. 225).

**Procedural history**

Mason's claim for DIB and SSI disability benefits has been denied by the Social Security Administration. His claim was initially denied on or about November 21, 1994. (R. 96-100). In denying the application, the Social Security Administration noted:

> The medical evidence in file documents that your seizures are controlled at this time and stabilized and would be further controlled with compliance of medical instructions and taking medication. Recently, you have been taken off seizure control medicine and have not had any seizures. The seizures that you have had were infrequent and would not have interrupted your ability to resume work activity.
>
> We have determined that your condition does not keep you from working.

(R. 96). Mason requested review, and the Social Security Administration again denied his request for benefits. (R. 101-110). Ultimately, in March 1995, Mason requested a hearing with an Administrative Law Judge ("ALJ"). (R. 111). In his request, Mason, for the first time, stated that he was unable to work due to weakness and arthritis in his hips, in addition to the seizures. (R. 111).

Mason requested a hearing, which was held on September 13, 1994, about two weeks before Mason's death. At the hearing, the ALJ warned Mason that it was "not in [his] best interest to even exaggerate" because the ALJ considered "exaggeration a form of lying." Mason and his friend, Robert Barefield testified at the hearing. On July 18, 1996, the ALJ issued a decision in which he concluded that Mason was not entitled to either disability insurance benefits or supplemental security income. (R. 21-27). The ALJ concluded that Mason was not disabled because he retained the capacity to perform the full range of light work available in the economy. (R. 26).

Mason's children filed suit in federal district court seeking review of the decision by the Social Security Administration. Pursuant to the stipulation of the parties and sentence four of 42 U.S.C. § 405(g), Judge Pallmeyer remanded the case to the Social Security Administration for further proceedings. (R. 284).

The ALJ conducted a second hearing on October 15, 2002. (R. 387). At the hearing, Dr. Ashok Jilhewar, M.D. ("Dr. Jilhewar") testified as an impartial expert witness. (R. 392). Dr. Jilhewar's specialty is internal medicine, and his sub-specialty is gastroenterology. (R. 392). Dr. Jilhewar had reviewed all of Mason's medical records before the hearing. (R. 392).

Dr. Jilhewar explained that Mason's seizures were caused by alcohol withdrawal. (R. 393, 396). He explained that the reason that alcohol was not found in Mason's system when he had seizures was that the seizure does not happen when alcohol is present in the system; but, rather, it was the *withdrawal* from alcohol that was causing the seizures. (R. 393). Dr. Jilhewar testified that occasional drinking does not cause withdrawal seizures. (R. 417). He testified that a person would have to consume consistently the equivalent of about fourteen beers per week

and then stop to experience the seizure symptoms. (R. 417.) According to the expert, Mason likely had not consumed alcohol for 24 to 48 hours before each seizure. (R. 410). Dr. Jilhewar explained that one way to tell that the seizures were caused by alcohol is that Mason's SGOT (a liver enzyme) was elevated (between 200-300 when 40 was normal) while his SGBT (another liver enzyme) was normal. (R. 395). According to Dr. Jilhewar, that combination occurs only in an alcoholic's liver. (R. 395).

Dr. Jilhewar testified that he generally prescribes prenatal vitamins for alcohol withdrawal symptoms. (R. 419-420). The prenatal vitamins contain 100 mg of Tiamine, which helps prevent the effect of alcohol withdrawal on the brain and nervous system.

The doctor also noted that he did not believe Mason's statements about decreased drinking due to Mason's platelet count. (R. 396). Dr. Jilhewar explained that a normal platelet count is more than 200,000, while Mason's was closer to 53,000. (R. 396). The doctor explained that platelets regenerate within four weeks, and that Mason's would have been expected to have been significantly higher had he actually stopped drinking. (R. 396-397).

Dr. Jilhewar explained other effects alcohol has on the body. (R. 399). He noted that the effect of alcohol on the system is the same whether it is daily consumption or binge consumption. (R. 399). Alcohol also can cause people to lose weight. Dr. Jilhewar testified:

> You know alcohol is unfortunately a poison to our system in excessive amounts, and we kill our small bowel lining cells, or what is called a epithelial with alcohol. So most of my patients who are on a binge, they have the episodes of malabsorption. . . . They do not absorb whatever they eat, plus they don't eat properly because they are on a high they don't you know hunger. And secondly, whatever they eat it is not absorbed properly it goes in the stools. And so that is a common cause in my patients.

-10-

(R. 400). He explained that if a patient stops drinking for six months, most of his laboratory results would return to normal. (R. 399).

Dr. Jilhewar concluded that Mason met the listing requirements of 5.05(c) based on his review of Mason's bilirubin levels as recorded in his medical records. (R. 394). Dr. Jilhewar noted that the first time Mason's bilirubin level was above 2.5 was September 7, 1994. (R. 394). Dr. Jilhewar also concluded that Mason met the listing requirements of 11.02 (seizures). (R. 398).

With respect to listing 5.08 (weight loss due to gastrointestinal disorder), Dr. Jilhewar concluded that Mason did not meet the requirements until January 1995. (R. 395).

After the second hearing, the ALJ issued a decision denying benefits. (R. 269-280). The ALJ first noted that in order to collect benefits, Mason had to have met the definition of disability as of December 31, 1994. (R. 270). At Step Three of his analysis, the ALJ concluded that Mason's impairment met the severity of two of the listings in the Social Security Administration's regulations. Specifically, the ALJ concluded that Mason's liver disease met the requirements of listed impairment 5.05(c) (chronic liver disease with serum bilirubin of 2.5 mg per deciliter or greater) and 12.09(f) (liver damage caused by substance addiction). (R. 271). The ALJ concluded that Mason did not meet the requirements of listing 5.08(a) (weight loss due to gastrointestinal disorder) because Mason weighed 120 pounds as of September 2004.

Once the ALJ concluded that Mason was disabled, the ALJ considered whether alcohol abuse was a contributing factor material to the decision and concluded that it was material. The ALJ explained:

> [T]he link between the claimant's liver disease and his drinking is beyond reasonable dispute. The claimant had "alcohol hepititis" (e.g., Exhibit 45/1) and

-11-

the strong connection with his alcohol consumption is also documented on his death certificate, where, as already noted, the term "alcohol" is listed three times (Exhibit 31). The cornerstone for treatment for this condition is the suspension of alcohol consumption, plain and simple. . . . On August 24, 1995, just 33 days before he died, he was told, "No drinking alcohol, your life depends on it," which appears boldly in the progress notes (Exhibit) 45/17). Other than following a general diet and taking a vitamin (and avoiding consumption of aspirin) the suspension of drinking was, apparently, <u>the</u> treatment for his liver disease and related complications. There had to have been an expectation of improvement for his doctors to have been so emphatic and insistent.

Dr. Jilhewar testified that the claimant had alcohol-related liver disease. He further testified that had the claimant stopped drinking most of his laboratory results would have returned to normal within six months. He went on to testify that alcohol is a poison to the system in even moderate amounts and that it can lead to malabsorption and lack of appetite.

* * *

A sober claimant would have been capable of a limited range of light work and he would have been "not disabled" at Step 5 of sequential evaluation.

* * *

To summarize, the claimant was capable of performing "other" jobs existing in the national economy up until September 7, 1994. Thereafter, he was unable to work, but his continued alcohol consumption was material to that incapacity. Accordingly, the claimant was not under a "disability" for purposes of eligibility to benefits under either titles II and XVI of the Social Security Act at any time through the date of his death.

(R. 278-279).

Mason's children filed an action in this Court for review of that decision. Both sides have moved for summary judgment.

## II. <u>Standards</u>

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When making such a determination, the Court must construe the

-12-

evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

An individual denied Social Security benefits by the Commissioner of the Social Security Administration may seek review at the district court. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" *See* 42 U.S.C. § 405(g). This Court's review is limited to determining whether the ALJ's decision is "both supported by substantial evidence and based on the proper legal criteria." *Scheck v. Barnhart*, 357 F.3d 697, 698 (7th Cir. 2004). Substantial evidence is that which a reasonable mind would accept as support of a conclusion. *Id.* If the ALJ's decision is supported by substantial evidence, it "will be upheld even if an alternative position is also supported by substantial evidence." *Scheck*, 357 F.3d at 698 (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

### III. Discussion

The standards for supplemental security income are "materially the same" as the standards for DIB Social Security. *Donahue v. Barnhart*, 279 F.3d 441, 443 (7th Cir. 2002). To qualify for disability benefits under the Social Security Act, one must, among other things, be under a "disability," which is defined under the Act as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months

42 U.S.C. §§ 423(a)(1)(D); 423(d)(1). As the Seventh Circuit has explained, "supplemental security income is not a form of unemployment insurance and is unavailable if any do-able work exists in the national economy, even if other persons with better skills are likely to be hired instead." *Donahue*, 279 F.3d at 443.

> In determining whether a claimant is disabled, the ALJ must consider whether:
>
> (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe v. Barnhart*, 425 F.3d 345, 351-352 (7th Cir. 2005) (citing 20 C.F.R. §§ 404.1520, 416.920). The claimant has the burden of proof with respect to steps one through four, and the burden shifts to the Commissioner with respect to step five. *Briscoe*, 425 F.3d at 352. A finding of disability "requires an affirmative answer at either step three or step five." *Briscoe*, 425 F.3d at 352. "A negative answer at any point, other than Step 3, stops the inquiry and leads to a determination that the claimant is not disabled." *Porter v. Bowen*, Case No. 8190, 1989 WL 153000 at * 2 (N.D. Ill. 1989) (citing 20 C.F.R. § 416.920).

Even if a claimant is otherwise entitled to benefits, Congress has prohibited the payment of disability benefits to any claimant whose disability was caused by drug or alcohol addiction. Pursuant to the 1996 amendments to the Social Security Act, "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). Section 423(d)(2)(C) applies to any claimants who have not had their claims finally adjudicated as of March 29, 1996. *O'Kane v.*

*Apfel*, 224 F.3d 686, 690 (7th Cir. 2000). In its regulations, the Social Security Administration informs claimants that it will determine whether alcohol or drug addiction is a material "contributing factor" by considering whether the individual "would still be disabled if [he] stopped using drugs or alcohol." 20 C.F.R. § 416.935.

Here, the parties do not dispute that the ALJ applied the proper legal standard when he considered the five steps set out in the regulations. The parties dispute two things. First, the parties dispute whether substantial evidence supports the ALJ's decision at Step Three. Second, the parties dispute whether the ALJ properly concluded that alcohol was a contributing factor material to the disability determination such that Mason was not entitled to disability benefits.

*Whether Mason had an impairment listed as severe in the regulations*

The ALJ considered whether Mason was disabled on or before December 31, 1994 because that was the last date he met the disability insured status requirements. (R. 270). No party disputes that decision.

With respect to Step Three, the ALJ concluded that Mason's impairments were equal to two of the impairments listed (in Appendix 1 to the regulations) as being so severe as to preclude substantial gainful activity. Specifically, the ALJ concluded that Mason's impairments met the requirements of listed impairment 5.05(c), which is chronic liver disease with serum bilirubin of 2.5 mg or more per deciliter. The ALJ also concluded that Mason's impairments met the requirements of listing 12.09(f), which is liver damage caused by substance addiction. The parties do not challenge these conclusions, and the Court believes that they are supported by substantial evidence.

Plaintiffs, however, believe that the ALJ should have concluded that Mason's impairment met the requirements of listing 5.08(a), which is weight loss due to gastrointestinal disorder. The listing requires weight of less than 109 pounds for a male who is 5'8" and 112 for a male who is 5'9". Substantial evidence supports the ALJ's conclusion that as of December 31, 1994, Mason did not meet listing 5.08(a). Evidence in the record suggested that Mason weighed 120 pounds as of September 1994. By September 1995, Mason weighed only 100 pounds. But there is no evidence in the record that Mason weighed less than 109 pounds at any time prior to December 31, 1994. Accordingly, the ALJ's conclusion with respect to Step Three is supported by substantial evidence.

*Whether alcohol abuse was a contributing factor material to Mason's disability*

The ALJ also concluded that alcohol was a contributing factor material to the disability determination. Mason's sons make two arguments in an attempt to convince the Court that the ALJ's decision is not supported. First, Mason's sons argue that the 1996 amendments should not apply to Mason, who was deceased when the amendments were passed. Second, Mason's sons argue that the ALJ's decision was not supported by substantial evidence.

Plaintiffs argue that the 1996 amendments–which prohibited the payment of disability benefits if drug or alcohol use was a contributing factor material to the disability decision–should not apply to Mason. In the amendments, Congress wrote in a provision describing when and to whom the amendments applied. *See* 42 U.S.C. § 405. As interpreted by the Seventh Circuit, the 1996 amendments apply to any claimants who have not had their claims finally adjudicated as of March 29, 1996. *O'Kane v. Apfel*, 224 F.3d 686, 690 (7th Cir. 2000). Plaintiffs recognize *O'Kane* but argue that the amendments should not apply to Mason, who was already deceased

when the amendments were passed.  The Court does not agree.  Congress drew a clear line, and Mason–because his claim was not finally adjudicated–fell on the side of immediate application.  In reaching its decision in *O'Kane*, the Seventh Circuit rejected the idea that such a retroactive effect (to claimants who had not yet obtained final adjudications) was unfair or unjust.  The Seventh Circuit noted, "When Congress clearly intends to preclude benefits for applications pending at the time of a statute's enactment, we must follow Congress's wishes."  *O'Kane*, 224 F.3d 691.  The court added, "Congress deliberately precluded benefits to pending claims.  '[D]rawing lines is the business of Congress and inevitably individuals on the wrong side of the division do not fare well.  The result is unfortunate for those adversely affected, but arbitrariness is often unavoidable.'"  *O'Kane*, 224 F.3d at 692 (quoting *Torres v. Chater*, 125 F.3d 166, 171 (3d Cir. 1997)).  Congress drew the line, and the Court will not move it for Mason.  The 1996 amendments apply to his claim.

Next, plaintiffs argue that the ALJ's conclusion (that alcohol was a contributing factor) was not supported by substantial evidence.  The Court disagrees.  As the ALJ stated, "the link between the claimant's liver disease and his drinking is beyond dispute."  (R. 278).  Substantial evidence supports that conclusion.  No fewer than six *separate* medical professionals examined Mason and concluded that his seizures and liver problems were caused by alcohol consumption.  (R. 131-132, 145-146, 161, 175, 204, 233, 349).  The independent medical expert, Dr. Jilhewar, who testified at the hearing agreed.  (R. 393, 396).  The expert testified that the level of Mason's liver enzymes and his low platelet count suggested that his problems were caused by alcohol, as opposed to some other problem.  (R. 395, 396).  Dr. Epner noted that an EEG showed no epileptic activity, thereby ruling out epilepsy as the cause of Mason's seizures.  (R. 201).  In

addition, although Mason sometimes denied using alcohol, Mason admitted on multiple occasions that he was consuming large quantities of alcohol. (R. 199, 201, 208, 240, 309, 331). The amounts Mason admitted to consuming were above the amounts Dr. Jilhewar testified would cause alcohol withdrawal symptoms. (R. 417). Granted, some testimony, such as that of Mason's sons and friend Robert Barefield, suggested that Mason was not drinking. But the Court will not reweigh the evidence. It simply considers whether substantial evidence supports the ALJ's decision, and it does.

The ALJ also considered whether Mason would be disabled if he had stopped drinking alcohol and concluded that he would not be. This, too, was supported by substantial evidence. First, Dr. Jilhewar testified that when alcoholics stop drinking, their laboratory results usually return to normal within six months. (R. 399). Second, Mason's remaining ailments–joint aches–were not sufficiently severe to prevent him from working. Mason testified that he had been bothered by occasional pain in his legs, hip, feet and back since 1968. (R. 59-60). According to Mason, those pains usually "kick[ed]" in during damp or cold weather and lasted a day. (R. 60). Mason worked many years after those pains commenced. (R. 47-49, 116). When Dr. Kenney performed a functional capacity assessment on Mason, he found no exertional, no postural, and no manipulative limitations. (R. 185-188). Another reviewer concluded that based on Mason's functional capacity, he could perform light work. (R. 102-103). As to Mason's mental capacity to perform unskilled work, Dr. Bone, M.D. found no evidence of mental disorders, psychotic disorders, affective disorders or anxiety disorders. (R. 88-91). Dr. Tomassetti, Ph.D, concluded that Mason had the mental capacity to perform unskilled work. (R.

206-208). Accordingly, substantial evidence supported the ALJ's conclusion that Mason would not have been disabled if he stopped drinking alcohol.

The ALJ properly concluded that alcohol was a contributing factor material to Mason's disability. He was not entitled to disability benefits.

The final decision of the Commissioner of the Social Security Administration is supported by substantial evidence. Accordingly, defendant is entitled to summary judgment on the administrative record.

## IV. Conclusion

For the reasons set forth above, the Court denies plaintiffs' motion for judgment. The Court grants defendant's motion for judgment.

ENTER:

*George M. Marovich*

George M. Marovich
United States District Judge

DATED: October 17, 2006